**ORTHO PHARMACEUTICAL CORPORATION, Plaintiff,**

v.

**AMGEN, INC., Defendant.**

**Civ. A. No. 89-34-JJF.**

United States District Court, D. Delaware.

March 23, 1989.

---

John A. Parkins, Jr. of Richards, Layton & Finger, Wilmington, Del., for plaintiff; David F. Dobbins, Gregory L. Diskant, Frederick B. Campbell and John J. Sipos of Patterson, Belknap, Webb & Tyler, New York City, of counsel.

Douglas E. Whitney and Matthew B. Lehr of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant; Paul A. Renne, Lloyd R. Day, Jr., Louis M. Lupin, Linda A. Sasaki of Cooley Godward Castro Huddleson & Tatum, Palo Alto, Cal., of counsel.

## OPINION

FARNAN, District Judge:

This action is before the Court on plaintiff Ortho Pharmaceutical Corporation's ("Ortho") motion for preliminary injunctive relief and defendant Amgen, Inc.'s ("Amgen") motion to dismiss or stay the action pending arbitration and for sanctions. Ortho, a subsidiary of Johnson & Johnson, is incorporated and maintains its principal place of business in New Jersey. Ortho researches, develops, manufactures, and markets pharmaceutical and biological products. Amgen is a Delaware corporation with its principal place of business in California, where it is involved in the research, development and manufacture of several bio-engineered products, including recombinant erythropoietin ("EPO"). The dispute between Ortho and Amgen revolves around the FDA approval, commercial manufacture and license to sell EPO in the United States.

The Court has diversity jurisdiction over this dispute under 28 U.S.C. section 1332. This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) following the completed briefing of these motions and an evidentiary hearing held on March 17, 1989.

## FACTUAL BACKGROUND

The factual history behind this dispute is lengthy, detailed, and complex. In order to resolve this matter as promptly as possible, the Court will set out the essential facts.

### 1. *EPO*

EPO is a natural body protein produced primarily by the kidneys. EPO is vital to internal body functions because it produces red blood cells which transport oxygen throughout the body. The body must produce EPO continuously to generate a regular and adequate supply of red blood cells. People who suffer from anemia causing diseases such as chronic kidney failure, AIDS, and cancer, produce insufficient EPO to maintain an adequate red blood cell supply. Thus, the commercial availability of manufactured EPO to those suffering from a variety of diseases is invaluable.

The development of EPO as a commercial product began in the early 1980s. At that time Ortho participated in the production of small quantities of EPO aboard the NASA space shuttle. By 1985, Amgen had developed the recombinant technology necessary to manufacture EPO for human use and was close to developing a process to produce significant quantities of EPO for commercial marketing. Hearing Transcript, Docket Item (D.I.) 78, Wilson at 12; Amended Complaint, D.I. 42, Ex. 1. However, as a small company, Amgen was having financial difficulties proceeding with its research. Ortho, on the other hand, had access to the monetary resources and research facilities of Johnson & Johnson, but it did not have the recombinant technology necessary to manufacture EPO. D.I. 78 at 11.

### 2. *Ortho–Amgen Agreement*

In 1985, Ortho and Amgen decided to join their knowledge and resources in the development of EPO for human use and commercial marketing. Ortho and Amgen signed a product license agreement (the "Agreement") in September, 1985, in which they set out certain principles regarding FDA approval, commercial manufacture and marketing of various products, including EPO, in the United States.[1] Plaintiff's Ex. 1.

As it pertained to EPO, the Agreement essentially provided that Amgen would retain exclusive rights to the dialysis market for EPO, while Ortho would obtain the rights to all other uses of EPO. Plaintiff's Ex. 1, ¶¶ 1.14(a), 1.21, 3.03(i). Amgen would manufacture EPO for both parties, supplying Ortho's requirements at Amgen's standard cost. Plaintiff's Ex. 1, ¶ 5.01. The Agreement also provided that each company was responsible for obtaining its own FDA approval but would exchange and cross-reference all information in this regard to expedite approval of both applications by the FDA. Plaintiff's Ex. 1, ¶¶ 3.02, 3.03(i), 3.04. The Agreement further contemplated that a more detailed manufacture and supply agreement would be entered into when the parties knew Ortho's requirements and Amgen's standard cost.

### 3. *Food and Drug Administration Involvement*

In May, 1987, Amgen and Ortho met with FDA officials with respect to commencing the approval process for EPO. D.I. 78, Longstreet at 46; Plaintiff's Exs. 6–8. Amgen and Ortho met separately with FDA officials but on the same day. During Ortho's meeting, Amgen observers were present and during Amgen's meeting, Ortho observers were present. D.I. 78, Alton at 355. At their respective meetings, both companies discussed their contractual division of the EPO commercial market and their intention that each company file for

FDA approval of EPO for their separate commercial uses as dictated by their Agreement. D.I. 78, Alton at 357.

During the May, 1987 meetings the FDA officials who were present expressed their strong interest in approving EPO for use in the United States, but expressed their reservations with regard to both Amgen and Ortho pursuing separate applications. Apparently, the FDA believed that if Amgen and Ortho filed separately the FDA might be in the position of interjecting itself into the commercial arrangements of the parties. Plaintiff's Ex. 7. The FDA, therefore, counseled the parties that it would prefer that Amgen and Ortho submit one application covering all the indications for EPO, since the FDA viewed EPO as the same drug regardless of the companies' intended commercial use. The FDA officials at the meeting opined that two separate applications would only confuse and delay the approval process. Plaintiff's Ex. 7 at pp. 1–2; D.I. 78, Longstreet at 54, Binder at 322–23.

As a result of the meeting, both companies understood that the FDA wanted Ortho and Amgen to file one joint PLA/ELA (Product License Application/Establishment License Application) with respect to EPO for the indication of chronic renal failure. Plaintiff's Exs. 6, 7, 8; D.I. 78, Binder at 316–317, Longstreet at 52. This joint PLA/ELA would seek FDA approval for both companies' commercial markets. Thereafter, on June 12, 1987, Ortho and Amgen met to discuss the FDA's preference for one filing. D.I. 78, Binder at 317–318. At the meeting, Amgen proposed, along with other matters, that it would submit one FDA filing for chronic renal failure. Plaintiff's Ex. 10. Amgen's proposal provided that Amgen would file the single PLA/ELA and supplement that application with Ortho's clinical data for Ortho's commercial market. Plaintiff's Exs. 12a, 13; D.I. 78, Binder at 333–334. In September, 1987, Amgen specifically agreed to supplement its PLA/ELA with

---

**1.** The Court notes that Ortho is now engaged in the manufacture and sale of EPO in certain European countries through an English affiliate.

Ortho's data in April, 1988. Plaintiff's Ex. 13; D.I. 78, Alton at 372, Binder at 333–334. Amgen prepared its PLA/ELA in the summer of 1987 with Ortho's help. D.I. 78, Alton at 387. Amgen filed its application for chronic renal failure in October, 1987. Amgen, however, never supplemented its PLA/ELA with Ortho data, despite Ortho's request to do so. Amgen alleges that before it could file the supplement, it needed further agreement on other matters discussed on June 12, 1987, such as Ortho's requirements for EPO and an agreement on price, both of which Ortho allegedly refused to discuss. Over the course of 15 months, from June, 1987 until September, 1988, the parties exchanged a number of draft proposals on marketing collaboration. Although none of these was finally signed, none of them contemplated Ortho filing separately with the FDA. Plaintiff's Ex. 20 (sealed); D.I. 78, Longstreet at 89. During that time period, Amgen knew Ortho had not made a separate application and Amgen certainly did not want Ortho to make a separate application. D.I. 78, Binder at 322–323, 345. The Court finds that as a result of the parties' discussions, proposals and conduct during the 15 month period after the May, 1987 meetings with the FDA their 1985 Agreement was modified.

Amgen now contends that Ortho could have and should have filed on its own with the FDA, D.I. 78, Alton at 373, despite the fact that such an action would have been contrary to the FDA's stated preference for one EPO application and contrary to the Agreement of the parties as modified.

### 4. *The Souring of the Parties' Relationship*

The parties' commercial relationship with respect to EPO began to sour for a variety of reasons.

Amgen disregarded its obligation to supplement its PLA/ELA with Ortho data, while assuring Ortho and the FDA that it would do so, and asking Ortho to refrain from making its own filing. Further, Amgen had unrealistic ideas about the price it would charge Ortho under the Agreement. Amgen initially suggested to Ortho that the standard cost price it would charge Ortho was $300,000 per gram. D.I. 78, Williams at 163; Plaintiff's Ex. 21. Gordon Binder, Amgen's Chief Executive Officer, implied in his testimony that this was reasonable because he was aware of another company that charges $200,000 per gram in Europe. D.I. 78, Binder at 306. However, no evidence was presented that the $200,000 per gram referred to by Binder was based on standard cost or arrived at pursuant to a contract that mandated a standard cost price. Further, evidence to the contrary estimated that a reasonable price based on the experimental start up costs quoted to Ortho by Amgen would be $40,000—$45,000 per gram. D.I. 78, Longstreet at 104. Dennis Longstreet, President of Ortho's Biotech Division, testified that based on Ortho's European manufacturing experience a price of $40,000—$45,000 per gram would be reasonable based on standard cost. *Id.*

In addition, Amgen seems to have developed some paranoia with respect to its commercial relationship with Ortho. Amgen became concerned about negative comments with respect to Amgen's ability to provide clinical supplies. According to Amgen personnel, these comments were allegedly made by Ortho and communicated to Amgen by Amgen investigators, stock analysts and other outsiders to the parties' 1985 Agreement. D.I. 78, Alton at 349. These third party comments seem to have influenced Amgen's actions with respect to the Ortho agreement and other aspects of their relationship. Finally, Amgen apparently believed that Ortho focused on the wrong indications for EPO in an attempt to usurp Amgen's reserved market. D.I. 78, Alton 362–363, 367–69.

On the other hand, Ortho soured the relationship by failing to agree with Amgen on what Ortho's supply requirements would be, stating that Ortho did not know its supply requirements. Further, when Ortho recognized Amgen was unwilling to perform per the modified Agreement, Ortho should have sought arbitration of this issue in April, 1988.

In any event, the Court finds that neither party was blameless in the demise of their contractual relationship, and the current status of the parties' business relationship appears to be beyond any private resolution.

5. *Present Status of Dispute and Other Proceedings*

Because of the demise of the business relationship between the parties, Ortho filed on January 23, 1989, for expedited arbitration procedures with the American Arbitration Association as provided for in Paragraph 10.07 of the 1985 Ortho–Amgen Agreement. Plaintiff's Ex. 1. Amgen has since counter-filed for arbitration on other issues. On January 31, 1989, Ortho filed this suit requesting preliminary injunctive relief to maintain the status quo pending expedited arbitration. Both the parties and the Court agree that the ultimate determination of the issues in dispute should be made in arbitration. However, on February 1, 1989, the FDA, contrary to its May, 1987 position, involved itself in the commercial interests of the parties. The relevant FDA action came at a time when the FDA knew both parties had requested arbitration pursuant to their 1985 Agreement and that Ortho had filed this lawsuit. D.I. 78, Alton at 382.

On February 1, 1989, Amgen officers Larry Johnson, Harry Hixson, Kirby Alton, and Darryl Hill met with the following FDA representatives: Donald Hill, Director of the Division of Product Certification; Sharon Risso, an employee in the Product Certification Department and a reviewer of Amgen's application; and Dr. Fratantoni, M.D., Chairman of the Review Committee. D.I. 78, Johnson at 390. At that meeting Dr. Fratantoni asked the Amgen officers what their position would be if the FDA restricted its approval of EPO under Amgen's pending PLA to a "dialysis only" indication, purportedly because Amgen had only submitted data on a "dialysis only" indication. *Id.*

Amgen, through its President, Harry Hixson, agreed to accept the restriction. Thereafter, by letter dated February 9, 1989, Mr. Johnson confirmed Amgen's willingness to have its EPO application limited to a "dialysis only" indication. D.I. 78 at 391. It should be noted that Mr. Johnson's letter is drafted so as to indicate that the "dialysis only" limitation is being requested by Amgen, and not in response to an FDA suggestion. Then, on February 23, 1989, Sharon Risso again contacted Amgen's Larry Johnson regarding a further change of Amgen's pending application. D.I. 78 at 391–392. According to Mr. Johnson, Ms. Risso told him she had attended a meeting with FDA personnel from the Orphan Drug Department and there was concern that if Amgen received approval for an indication or use worded differently from Amgen's Orphan Drug designation, another company might be able to have Amgen's Orphan drug designation set aside. D.I. 78 at 392. Risso suggested that Amgen consider whether it wanted to have the indication on its application worded identically to Amgen's Orphan Drug designation. *Id.* As a result of that conversation, Mr. Johnson wrote a letter dated February 23, 1989, to Paul D. Parkman, M.D., Director of the Center for Biologics Evaluation and Research at the FDA. Plaintiff's Ex. 26. The letter reads in part:

> Dear Dr. Parkman:
>
> In a telephone conversation of this date, FDA's Ms. Sharon Risso requested certain amendments to Amgen's previous submissions to the PLA 87–0536 file.
>
> Ms. Risso requested clarification of Amgen's proposed indication for EPOGEN ™ (epoetin-alfa), the subject of the above referenced PLA. To ensure consistency with Amgen's orphan drug designation for this product, we propose that the indication be as follows:
>
>> "EPOGEN ™ is indicated to elevate or maintain the red blood cell level (as manifested by the hematocrit or hemoglobin determinations) in dialysis patients with anemia associated with end-stage renal disease, and to obviate the need for transfusions in these patients.
>
> If FDA concurs, the package insert and advertising materials will be amended to so indicate....

Mr. Johnson's letter to the FDA is written as if it were Amgen's proposed compliance with an FDA request for clarification. However, the testimony and letter discussed above, as well as Mr. Johnson's note to Dr. Fratantoni explaining the letter (Plaintiff's Ex. 37) make clear that the FDA advised Amgen to make these specific changes. These changes would not only expedite the approval process for Amgen but would ensure that Amgen would obtain the coveted Orphan drug status which would guarantee Amgen a seven year monopoly on EPO in the United States. The Court is troubled by the contact between the FDA personnel and Amgen officials with regard to Amgen's pending application. The contact is especially troubling in this case because it came at a time when the parties were actively engaged in a federal lawsuit and arbitration in an effort to resolve their various claims, and the action recommended by FDA reviewers could have a significant impact on the outcome of these efforts. Further the FDA reviewers also sought to influence the competitive positions of Amgen vis-a-vis Chugai Genetics Institute, a Japanese corporation that also has a PLA for EPO pending before the FDA, seeking approval similar to Amgen.[2] D.I. 78, Binder at 309–310. Ms. Risso's assistance to speed approval of Amgen's application might eliminate Ortho's market, i.e., non-dialysis indications, and allow Amgen to beat the Japanese application to FDA approval.

## DISCUSSION

Initially, the issues raised by this dispute are:

1. Does this Court have jurisdiction to grant preliminary injunctive relief in light of the mandatory arbitration clause in the 1985 Agreement?

2. If the Court does have jurisdiction, has Ortho met the legal standard for preliminary injunctive relief entitling it to the relief sought?

### A. Jurisdiction

■ In general, federal policy favors the resolution of contractual disputes through arbitration agreements. *Moses Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–942, 74 L.Ed.2d 765 (1983), (citing The Federal Arbitration Act ("the Act"), 9 U.S.C. § 2 (1982)). The Act explicitly requires a federal court to stay the trial of any dispute subject to an arbitration agreement. 9 U.S.C. § 3. However, most circuit courts that have dealt with the issue of jurisdiction to grant preliminary injunctive relief in a dispute subject to arbitration have held that district courts have the discretion to grant such relief to preserve the status quo between the parties. *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1053 (4th Cir.1985); *PMS Distributing Co., Inc. v. Huber & Suhner*, 854 F.2d 355 (9th Cir.1988); *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir.1986); *Roso–Lino Beverage Distributors, Inc. v. The Coca–Cola Bottling Co. of New York*, 749 F.2d 124 (2d Cir. 1984); *Sauer–Getriebe KG v. White Hydraulics, Inc.*, 715 F.2d 348 (7th Cir.1983), cert. denied 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984). *Contra Merrill Lynch Pierce Fenner & Smith v. Hovey*, 726 F.2d 1286 (8th Cir.1984); *Merrill Lynch Pierce Fenner & Smith v. Scott*, No. 83–1480 (10th Cir. May 12, 1983).

The circumstances under which courts have held that a district court may grant preliminary injunctive relief are when failure to grant such relief would render subsequent arbitration a "hollow formality." *Bradley*, 756 F.2d at 1053. Subsequent arbitration would become a hollow formality if arbitration were incapable of returning the parties to the status quo ante in the absence of the requested preliminary relief. *Id.* at 1053–54 (*citing Lever Bros. Co. v. International Chemical Workers Union, Local 217*, 554 F.2d 115, 123 (4th Cir.1976)).

The Court finds that the circumstances necessary to grant preliminary injunctive

---

**2.** Amgen is already embroiled in patent litigation with Chugai in federal court in Massachu-

setts with respect to EPO. D.I. 78, Binder at 306.

relief are present in this case. The Court finds that the status quo pending arbitration between the parties under their modified Agreement would be for Amgen to maintain its October, 1987 PLA for chronic renal failure supplemented by Ortho data. Amgen's letter to the FDA on February 23, 1989, narrowed its application, thus eliminating Ortho's opportunity to have its pre-dialysis data considered per the parties' modified Agreement and the May, 1987 FDA direction. If FDA approval of EPO were granted on Amgen's application as formulated today, Ortho would be severely prejudiced.

The Court's focus in determining the status quo pending arbitration must be the contractual rights and obligations of the parties as provided in their 1985 Agreement as modified by their correspondence and subsequent actions in conformity with that correspondence. It is not the Court's function to assist or hinder the FDA approval process for a desperately needed drug, or concern itself with speed or lack of speed involved in considering the Amgen application. Simply stated, the status of the FDA approval process is not relevant to this Court's consideration of the status quo of the parties' contractual disputes.

If Amgen had not acceded to the February, 1989 entreaties of FDA personnel the status quo of the parties as it pertains to their contractual dispute would have been maintained. But the latest actions by Amgen, albeit at FDA urging, severely altered the status of the parties as it existed in January, 1989, upon the filing of this lawsuit and the demand for arbitration. By way of example, Ortho seeks, as part of its remedy through arbitration that Amgen file Ortho's pre-dialysis data as a supplement to the pending chronic renal failure PLA, as required by the Agreement of the parties. However, if Amgen is permitted to unilaterally (without Ortho consent) amend its application to a dialysis only indication, more particularly to end stage renal disease, and obtains FDA approval, there will be no pending application for Amgen or Ortho to supplement. Such a result would certainly render the pending arbitration a "hollow formality." There

are other issues between the parties that could also illustrate the point, but it is clear that if Amgen is allowed to alter its FDA filing much of the relief Ortho seeks in arbitration will not be available. For this reason, the Court concludes that it has jurisdiction to entertain Ortho's application for a preliminary injunction.

## B. *Preliminary Injunction Standard*

■ To obtain preliminary injunctive relief in this Circuit, the moving party must make a showing of the following four factors:

1. Reasonable probability of eventual success on the merits.
2. Irreparable injury to the moving party.
3. Possibility of harm to other interested parties.
4. The public interest.

*Eli Lilly & Co., v. Premo Pharmaceutical Laboratories, Inc.,* 630 F.2d 120, 136 (3rd Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). The Court finds that Ortho has made the requisite showing on all four factors.

With regard to reasonable probability of success, the evidence has shown that Amgen agreed to submit Ortho's data as a supplement to the FDA's requested single application for chronic renal failure, and that Amgen failed to do so. Thus, it is reasonably probable that the ultimate arbitral award will be in Ortho's favor on this issue. Second, Ortho has shown a likelihood of irreparable injury in the absence of preliminary injunctive relief since the Court has found that without such relief an arbitration award could not return the parties to the status quo ante. Third, although there is always a possibility of harm to other interested parties when preliminary relief is granted, the Court believes that the requested relief may be structured in a way to avoid such harm.

The fourth element, public interest, is the most critical element to the determination that preliminary relief should be granted in this case. The Court finds that the public interest will be best served by an order maintaining the course of the Amgen–Or-

tho application as set by the FDA in May, 1987. The FDA is the regulatory agency charged with protecting the public interest in such matters. In May, 1987, the FDA requested one EPO application from Amgen–Ortho without regard to their commercial division of the EPO market per their 1985 Agreement. The FDA wanted to review the EPO application without becoming involved in the parties' commercial interests or permitting those interests to dictate FDA processes. The parties agreed to proceed as the FDA requested and keep their commercial interests separate from the FDA approval process. Amgen may not now unilaterally violate the parties' agreement and alter the FDA approval process at the suggestion of FDA employees. Amgen can only change its modified commercial agreement if Ortho agrees to do so.

If Amgen honors its contractual agreement to submit one EPO application supplemented by Ortho data the FDA is free, for example, to bifurcate the application and grant whatever approval it deems to be in the public interest. D.I. 78, Longstreet at 139–140. Although this could have the effect of benefiting Amgen's commercial interests over Ortho's it would not violate their private Agreement. The FDA cannot cause Amgen to violate its contractual obligation to further the FDA's desired result. Instead, the FDA should grant or deny approval for EPO in a manner best suited to serve the public. By granting preliminary relief the Court can maintain the parties' status quo and enable the FDA to make its decision with respect to EPO on the basis of the safety and efficacy of the drug and the public interest.

Accordingly, the Court is persuaded that for the purpose of maintaining the status quo between Amgen and Ortho as it pertains to their present contractual dispute the following actions shall be taken immediately: 1) Amgen shall withdraw its request to limit its PLA/ELA for EPO to End Stage Renal Disease–Dialysis Only; 2) Ortho shall withdraw any PLA it has filed with the FDA for EPO; 3) Amgen shall submit Ortho's data as a supplemental filing to its PLA/ELA; 4) the parties shall seek expedited arbitration on EPO issues.

Further, because the Court has jurisdiction over this matter, Amgen's motion to dismiss or stay the action and their request for sanctions will be denied.

The Court requests that the parties submit a proposed order no later than March 23, at 6:00 p.m.