**ORTHO PHARMACEUTICAL CORPORATION**

v.

**AMGEN, INC., Appellant.**

No. 89-3272.

United States Court of Appeals, Third Circuit.

Argued June 28, 1989.

Decided Aug. 17, 1989.

Paul A. Renne (argued), Lloyd R. Day, Jr., Cooley, Godward, Castro, Huddleson & Tatum, Palo Alto, Cal., Douglas E. Whitney, Matthew B. Lehr, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for appellant.

Eugene M. Gelernter (argued), Gregory L. Diskant, Patterson, Belknap, Webb & Tyler, New York City, John A. Parkins, Jr., Richards, Layton and Finger, Wilmington, Del., for appellee.

Before MANSMANN, SCIRICA and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

Defendant Amgen, Inc. appeals from the grant of a preliminary injunction in favor of plaintiff Ortho Pharmaceutical Company, in a contract dispute that the parties agreed to submit to arbitration. The primary issues in this appeal are whether the Federal Arbitration Act, 9 U.S.C. §§ 1–15 (1982), abrogates the district court's power to issue a preliminary injunction in an arbitrable dispute, and whether the district court erred in deciding that Ortho had met the prerequisites for a preliminary injunction.

The appeal is moot as it relates to paragraphs one and three of the district court order and will be dismissed. We will vacate and remand to the district court those

aspects of the order with continuing legal effect, to determine whether the circumstances continue to warrant the imposition of preliminary injunctive relief.

## I.

Amgen is a biotechnology company with the technology for the production of commercial quantities of erythropoietin (EPO), a human protein normally produced in the kidney, which stimulates the formation of red blood cells. Persons who develop chronic kidney disease often suffer from an impaired ability to make erythropoietin, which in turn results in an impaired ability to make red blood cells, a condition commonly known as anemia. By correcting the body's erythropoietin deficiency, synthetic EPO offers an alternative to the current form of treatment for this disease—repeated red blood cell or whole blood transfusions—which itself can present serious side-effects.

Ortho is a subsidiary of Johnson & Johnson involved in the research, development, manufacturing and marketing of pharmaceutical and biological medicines. On September 30, 1985, Amgen and Ortho entered into two written contracts, a Technology License Agreement and a Product License Agreement (collectively, the Agreement), to bring to market three different biological medicines: hepatitis B vaccine (Hep-B), Interluekin–2 (IL–2), and EPO.

Under the Agreement, Amgen granted Ortho an exclusive royalty-bearing license to market and sell EPO in the United States for all therapeutic indications except dialysis, reserving for itself the dialysis market. Additionally, Amgen promised to manufacture and supply Ortho's requirements for EPO in the United States.[1] Pur-

suant to the Public Health Service Act, 42 U.S.C. §§ 262 et seq. (1982), and accompanying regulations, 21 C.F.R. §§ 600–601.51 (1988), a biological substance such as EPO can be sold in the United States only after the Food and Drug Administration (FDA) approves both a Product License Application (PLA), which licenses the product, and an Establishment License Application (ELA), which licenses the manufacturing facility where the product is made.[2] The Agreement presupposed that each company was responsible for obtaining its own FDA approval, but would exchange and cross-reference all information in this regard to expedite approval of both applications by the FDA. Finally, the Agreement provided that the parties would submit to arbitration all disputes arising under the Agreement, and that California substantive law would govern their resolution.

During 1987, the parties began disputing their respective regulatory, marketing, and supply rights and obligations. More specifically, the parties differed over: the strategy for obtaining FDA approval, in particular, whether the two companies would submit a joint filing with the FDA or would individually file a separate PLA/ELA for their respective commercial markets; the acceptability of several marketing collaboration proposals, calculated in part to address Amgen's concern that Ortho's focus on the "pre-dialysis" market, combined with its desire to submit a joint PLA/ELA, would infringe on Amgen's reserved dialysis market;[3] and the price and quantity terms of the EPO supply arrangement which were left unspecified in the Agreement.

In October, 1987, Amgen filed its application with the FDA for the indication

---

**1.** The Agreement does not specify the details of the supply arrangement, but paragraph 5.01 provides that the parties would enter into an "appropriate Manufacture and Supply Agreement, relating to price, supply of products, ... disclosure of manufacturing technology, preparation and delivery specifications...." Paragraph 5.01 also provides that Amgen would supply EPO to Ortho at Amgen's "standard cost."

**2.** By regulation, only the manufacturer can apply for and obtain the required PLA and ELA. 21 C.F.R. § 601.2(a) ("To obtain a license for

any establishment or product, the manufacturer shall make application" to the FDA).

**3.** "Pre-dialysis" patients suffer from anemia associated with chronic renal failure that has not yet progressed so far as to require dialysis. Amgen claims there are only about 10,000 patients in the pre-dialysis market. Ortho, however, sets the number at 50,000, claiming they represent an independent market of chronic renal stage disease that Amgen admits it did not reserve.

"chronic renal failure," supported solely by its own clinical data from dialysis patients. This application never included Ortho's pre-dialysis clinical data.[4]

On January 23, 1989, Ortho filed a demand for arbitration with the American Arbitration Association. In addition to damages, Ortho sought from the arbitrator an order requiring Amgen to submit Ortho's clinical data to the FDA, to identify Ortho as a distributor in the PLA/ELA, to submit Ortho's label to the FDA, and to supply Ortho with EPO. Amgen filed for arbitration on other issues. On January 31, 1989, Ortho filed suit in the district court seeking preliminary injunctive relief "to maintain the *status quo* during the pendency of the arbitration proceeding." More specifically, Ortho claimed that Amgen had breached the Agreement by refusing to make the necessary filings with the FDA needed to enable Amgen to supply Ortho with EPO, including Amgen's refusal to submit Ortho's pre-dialysis clinical studies, and by refusing to supply finished EPO to Ortho. Ortho requested an injunction prohibiting Amgen from further prosecuting its PLA/ELA for EPO and from marketing EPO pending arbitration, unless Amgen were to make all filings necessary to permit Ortho to sell in its agreed-upon market. Without such relief, Ortho urged, Amgen would cause Ortho irreparable injury by preempting the entire EPO market for itself, thereby depriving Ortho of the benefits of the exclusive license.

While this litigation was pending, on February 9, 1989, after meeting with FDA representatives, Amgen wrote the FDA requesting permission to narrow its PLA/ELA to the indication "end-stage chronic renal failure," which would include only patients currently receiving dialysis treatment. Later that same month, Ortho filed with the FDA its own PLA/ELA for the indication of chronic renal failure.

After the parties had engaged in expedited discovery, the district court held an evidentiary hearing on March 17, 1989. On March 23, 1989, the district court issued its first opinion and accompanying order. *Ortho Pharmaceutical Corp. v. Amgen, Inc.,* 709 F.Supp. 504 (D.Del.1989). The district court determined that under the Federal Arbitration Act, it had the authority to issue a preliminary injunction "to preserve the *status quo* pending arbitration." *Id.* at 509–10. Accordingly, as the district court explained in denying Amgen's motion for reconsideration, the court "made certain limited findings of fact to ascertain the *status quo.*" *Ortho Pharmaceutical Corp. v. Amgen, Inc.,* No. 89–34–JJF, slip op. at 2 (D.Del. April 21, 1989). In this regard, the court found that Amgen and Ortho had agreed, through a course of conduct, to submit a joint PLA/ELA, and that the "status quo" of the parties was that of "one joint PLA/ELA ... with respect to EPO for the indication of chronic renal failure." 709 F.Supp. at 506–07. The court also held that Ortho had met the legal requirements for the issuance of injunctive relief. 709 F.Supp. at 510. The court mandated that: (1) Amgen withdraw its request to the FDA to limit its PLA/ELA to end-stage chronic renal failure (i.e., dialysis) (paragraph one of order); (2) Ortho withdraw the PLA/ELA it filed with the FDA insofar as it seeks approval for chronic renal failure (paragraph two); (3) Amgen submit to the FDA the Ortho data, as provided to Amgen by Ortho on February 7, 1989, as a supplemental filing to Amgen's PLA/ELA (paragraph three); (4) the parties provide reasonable prior notice to one another of all meetings with the FDA regarding Amgen's PLA/ELA, provide one another with all documents submitted to or received from the FDA regarding Amgen's PLA/ELA, make reasonable efforts to include one another in telephone conversations initiated by Amgen with FDA, and promptly copy for one another all memoranda reflecting such conversations (paragraph four); (5) Amgen submit to the FDA any supplementary or clarify-

---

**4.** Ortho claims that in April, 1988 it offered Amgen the pre-dialysis clinical data, but Amgen told Ortho not to send the data until the co-promotion agreement was finalized. In contrast, Amgen claims that Ortho "failed to transmit any clinical data to Amgen until February 7, 1989, and less than 20% of that data involved non-dialysis chronic renal failure patients...."

ing data provided by Ortho (paragraph five); and (6) the parties seek prompt resolution through arbitration, using expedited discovery, of "at least" the EPO issues between them (paragraph seven). *Ortho Pharmaceutical Corp. v. Amgen, Inc.*, 709 F.Supp. 504 (D.Del.1989) (order granting preliminary injunction).

Amgen complied fully with the district court order. On March 24, 1989, Amgen wrote to the FDA advising it that the company was withdrawing its request to limit its PLA indication to end-stage renal disease, i.e., dialysis only. On March 27, 1989, Amgen delivered to the FDA two sets of data provided by Ortho. Amgen refused, however, to deliver the "distributorship package," that would have listed Ortho as a distributor of EPO. According to Amgen, the delivery of such materials exceeded the scope of the district court's order, and, moreover, the parties had never entered a distributorship agreement with respect to EPO.

Amgen filed a motion for reconsideration and stay of the order pending reconsideration, and requested that the district court amend paragraph three of its order to indicate that Amgen was not obligated to submit Ortho's distributorship packet. In an opinion dated April 21, 1989, the district court denied Amgen's motion for reconsideration of the grant of the preliminary injunction. However, the court held that its March 23 order did not require Amgen to list Ortho as a distributor of EPO. *Ortho Pharmaceutical Corp. v. Amgen, Inc.*, No. 89–34–JJF, slip op. at 6 (D.Del. April 21, 1989).[5] Additionally, the district court specified that its findings of fact were not binding on the arbitrator. *Id.* at 2.

On June 1, 1989, while Amgen's appeal was pending, the FDA approved EPOGEN, Amgen's trade name for EPO, for the entire chronic renal failure indication.

## II.

Ortho contends that Amgen's appeal is "in large part moot." Ortho argues that the crux of the district court order, con-

tained in paragraphs one and three, required Amgen to maintain its PLA/ELA for the indication "chronic renal failure," rather than narrow it to cover only "end-stage renal failure," and to include Ortho's clinical pre-dialysis data in this submission. FDA approval of the application as submitted, Ortho asserts, leaves this court unable to remedy any alleged error committed by the district court in ordering such relief. Without conceding this point, Amgen responds that other aspects of the district court order continue to affect Amgen's substantive rights. First, Amgen asserts that paragraphs four and five of the order place Amgen under a continuing obligation to submit to the FDA whatever additional Ortho data may become necessary or appropriate and to include Ortho in any discussions with the FDA concerning Amgen's PLA/ELA for EPO. Second, Amgen claims that the district court order interferes with the parties' pending arbitration because paragraph seven requires the parties to expedite arbitration, and because the district court's factual determinations will prejudice the outcome of the arbitration. Third, Amgen argues that the district court opinion, by implying that there had been improper collusion between Amgen and FDA officials, adversely affects the ongoing relationship between Amgen and the FDA, and tarnishes Amgen's public image.

■ Federal courts, having jurisdiction only to decide actual cases and controversies, are "without the power to decide questions that cannot affect the rights of litigants in the case before them." *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705, 40 L.Ed.2d 164 (1974) (citations omitted). Accordingly, "an appeal must be dismissed as moot when an event occurs that prevents the appellate court from granting any effective relief, even if the dispute is decided in favor of the appellant." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 150 n. 6 (3d Cir.1986). On the other hand, an appeal is not moot if "the trial court's order will have possible collateral legal consequences." *International Brotherhood of*

---

**5.** This decision is the subject of another appeal not currently before this court.

*Boilermakers v. Kelly,* 815 F.2d 912, 916 n. 5 (3d Cir.1987) (citations omitted). A determination of mootness is "an intensely factual inquiry." *Id.* at 915. Paragraphs one and three of the district court order are moot. The FDA has approved Amgen's application for "chronic renal failure," which included Ortho's pre-dialysis data. Therefore, Amgen's substantive rights would not be affected by this court's reversal of those aspects of the order requiring Amgen to withdraw the request to narrow the PLA/ELA and to submit Ortho's pre-dialysis data. Nevertheless, as Ortho itself concedes, and we conclude, Amgen's appeal is not moot. As Ortho concedes, the portions of the district court order requiring communication (paragraph four), cooperation (paragraph five), and expedition (paragraph seven) continue to impose concrete burdens on the parties that would be lifted were this court to reverse the district court decision.

### III.

As an initial matter, we must decide whether the district court has subject matter jurisdiction to entertain a motion for preliminary injunctive relief in a dispute that the parties agree is arbitrable. Amgen argues that the plain words of § 3 of the Arbitration Act preclude a district court from issuing an injunction except to "stay other proceedings relating thereto." Amgen contends that to hold otherwise would necessarily embroil the courts in the merits of the controversy more appropriately left to the arbitrator. In addition, Amgen maintains that because even truncated judicial proceedings for interim relief may require depositions, document discovery, and briefing, these proceedings contravene the congressional intent "to move the parties to an arbitrable dispute out of court and into arbitration as quickly as possible," citing *Moses H. Cone Memori-*

*al Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 22, 103 S.Ct. 927, 940, 74 L.Ed.2d 765 (1983). Finally, Amgen argues that by agreeing to arbitrate all disputes, Ortho accepted "the risks associated with this choice, including loss of interim relief and the unavailability of discovery, in exchange for the benefits of arbitration."

Whether a district court has subject matter jurisdiction to grant injunctive relief in an arbitrable dispute presents a question of first impression for this court.[6] We find guidance, however, in the reasoning of the Courts of Appeals for the First, Second, Fourth, Seventh, and Ninth Circuits, all of which have determined that the Arbitration Act does not deprive the district court of the authority to grant interim relief in an arbitrable dispute, provided the court properly exercises its discretion in issuing the relief. *See Teradyne, Inc. v. Mostek Corp.,* 797 F.2d 43, 47 (1st Cir.1986) (summarizing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,* 756 F.2d 1048 (4th Cir.1985); *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124 (2d Cir.1984) (per curiam); *Sauer-Getriebe KG v. White Hydraulics, Inc.,* 715 F.2d 348 (7th Cir.1983), *cert. denied,* 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984)). *See also PMS Distributing Co., Inc. v. Huber & Suhner, A.G.,* 854 F.2d 355, 358 (9th Cir.1988) (citing *Teradyne* to support holding that Arbitration Act does not strip district court of power to grant writ of possession pending outcome of arbitration). Only the Court of Appeals for the Eighth Circuit appears to have expressly held otherwise. *See Merrill Lynch, Pierce, Fenner & Smith v. Hovey,* 726 F.2d 1286, 1291–92 (8th Cir.1984) ("where the Arbitration Act is applicable and no qualifying contractual language has been alleged, the district court errs in granting injunctive relief").[7] *See also Merrill*

---

**6.** Whether the Arbitration Act deprives the district court of subject matter jurisdiction to enter preliminary injunctive relief is an issue of law subject to plenary review. *See Dent v. Cunningham,* 786 F.2d 173, 175 (3d Cir.1986) (application of legal precepts subject to plenary review); *Chrysler Credit Corp. v. First Nat'l Bank & Trust Co.,* 746 F.2d 200, 202 (3d Cir.1984) (statutory

construction issue of law subject to plenary review).

**7.** *But see Ferry–More Seed Co. v. Food Corn, Inc.,* 729 F.2d 589 (8th Cir.1984) (two months after the Hovey decision, another Eighth Circuit panel affirmed the grant of a preliminary injunction in arbitrable dispute).

*Lynch, Pierce, Fenner & Smith, Inc. v. Scott,* No. 83–1480 (10th Cir. May 12, 1983) (vacating by order and without formal opinion a preliminary injunction that the district court had granted pending arbitration); *RGI, Inc. v. Tucker & Associates, Inc.,* 858 F.2d 227, 230 (5th Cir.1988) (where contract clause in arbitrable dispute specified that in the event the dispute was submitted for arbitration, the contract would continue in full force, issuance of preliminary injunction neither conflicted with *Hovey* (which left open the possibility of an injunction where the parties had contemplated its use beforehand) nor constituted an abuse of discretion).

We first consider Amgen's claim that the language of § 3 of the Arbitration Act expressly prevents the district court from entering preliminary injunctive relief. Section 3 provides:

§ 3. Stay of proceedings where issue therein referable to arbitration

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. Amgen asserts that the language providing that the district court "shall" stay "any suit or proceeding" regarding an issue that is referable to arbitration, expressly prohibits the district court from issuing a preliminary injunction in an arbitrable dispute. We disagree that the Arbitration Act expressly addresses the issue. *Accord Teradyne,* 797 F.2d at 47; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley,* 756 F.2d at 1052. As the Fourth Circuit explained in *Bradley,* § 3 declares only that the court shall stay the "trial of the action"; it does not mention preliminary injunctions or other pre-trial

proceedings. 756 F.2d at 1052. Indeed, "nothing in the statute's legislative history suggests that the word 'trial' should be given a meaning other than its common and ordinary usage." *Id.*

Consequently, we must decide whether the exercise of the district court's equitable powers would undermine the operation of the Arbitration Act, and is therefore implicitly prohibited. Like the majority of courts that have examined the issue, we find no conflict and thus no implicit prohibition. After an exhaustive discussion of various circuit and Supreme Court authority, the First Circuit in *Teradyne* summarized the rationale for the majority rule:

[T]his approach reinforces rather than detracts from the policy of the Arbitration Act.... We believe that the congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, *ipso facto,* the meaningfulness of the arbitration process.

*Teradyne,* 797 F.2d at 51. We find this reasoning convincing. As the Supreme Court stated in *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), the Arbitration Act was "motivated by a congressional desire to enforce agreements into which parties had entered." *Id.* at 220, 105 S.Ct. at 1242. We believe that an arbitration agreement reflects the parties' intention to adhere to an orderly process of alternative dispute resolution. Therefore, we do not construe such an agreement as constituting a "waiver" by either party of the right to seek preliminary injunctive relief necessary to prevent one party from unilaterally eviscerating the significance of the agreed-upon procedures.

 Therefore, we hold that a district court has the authority to grant injunctive relief in an arbitrable dispute, provided that the traditional prerequisites for such relief are satisfied. This court has consistently identified four factors that a court must consider in ascertaining the propriety of a preliminary injunction: (1) whether the

movant has demonstrated reasonable probability of eventual success in the litigation; (2) whether the movant has demonstrated that it will be irreparably injured *pendente lite* if relief is not granted to prevent a change in the *status quo;* (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. *See Constructors Assoc. of Western Pennsylvania v. Kreps,* 573 F.2d 811, 814–15 (3d Cir.1978); *see also A.L.K. Corp. v. Columbia Pictures Industries, Inc.,* 440 F.2d 761, 763 (3d Cir.1971). Absent an error of law or serious mistake in the consideration of proof, the district court's decision will be reversed only for an abuse of discretion. *Constructors Assoc. of Western Penn. v. Kreps,* 573 F.2d at 815. A reviewing court will find an abuse of discretion only when the district court has committed a "clear error of judgment," not simply because that reviewing court, applying the law to the facts of the case, could arguably reach a different result. *See Hohe v. Casey,* 868 F.2d 69, 70 (3d Cir.1989). When reviewing the grant of a preliminary injunction, we accord deference to the judgment of the district court "because of the infinite variety of situations which may confront it." *A.L.K. Corp. v. Columbia Pictures,* 440 F.2d at 763.

Our conclusion here—that in the case of an arbitrable dispute, the district court should apply the traditional test to determine whether the case is an appropriate one to issue injunctive relief, and that a reviewing court should accord deference to the district court's balancing of these traditional factors—comports with the views of other courts of appeals. After holding that "a district court can grant injunctive relief in an arbitrable dispute pending arbitration, provided the [traditional] prerequisites for injunctive relief are satisfied," *id.* at 51, the *Teradyne* court then reiterated that "[t]he decision to grant or deny a preliminary injunction is a matter for the discretion of the district court," *id.* at 52. Similarly, in *Roso–Lino Beverage Distributors,* 749 F.2d 124, the Second Circuit explained that the reviewing court must "determine whether the dispute is a 'proper case' for an injunction." *Id.* at 125. Ac-

cordingly, that court applied the circuit's traditional test for determining whether to issue a preliminary injunction. *Accord PMS Distributing Co., Inc.,* 854 F.2d at 358 ("[T]he Arbitration Act ... does not strip [the court] ... of authority to grant a writ of possession pending the outcome of the arbitration so long as the criteria for such a writ are met.").

Nevertheless, Amgen contends that even if the Arbitration Act does not abrogate entirely the district court's subject matter jurisdiction over arbitrable disputes, it at least limits that jurisdiction to "preservation of the status quo." Accordingly, Amgen argues that in this case, the district court "exceeded the scope of its jurisdiction" by: (1) "misperceiving" the *status quo;* (2) addressing the merits of the contractual dispute; and (3) granting relief that resolved the pending dispute. Central to Amgen's analysis is the belief that the *"status quo"* at the time arbitration was filed was that the FDA was considering Amgen's own PLA that did not include Ortho clinical data. Whether the district court exceeded the scope of its jurisdiction is an issue of law subject to plenary review by this court.

■ As our previous discussion indicates, we disagree that the "preservation of the *status quo*" operates as a separate test for determining whether the district court acted within its jurisdictional authority. Rather, the "preservation of the *status quo*" represents the goal of preliminary injunctive relief in any litigation, including in an arbitrable dispute. It is the balancing of the various factors of the traditional four-pronged test that bear upon the court's exercise of discretion:

[T]he most compelling reason in favor of ... [issuing a preliminary injunction] is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act. On the other hand, judicial intervention before the merits have been finally determined frequently imposes a burden on defendant that ultimately turns out to be unjustified. Consequently, the preliminary injunction is appropriate whenever the

policy of preserving the court's power to decide the case effectively outweighs the risk of imposing an interim restraint before it has done so.

Wright & Miller, Federal Practice and Procedure, § 2947 at 424 (1973). Thus, the function of this traditional test is to enable the court, on the basis of the data before it, "to attempt to minimize the probable harm to legally protected interests between the time that the motion for a preliminary injunction is filed and the time of the final hearing." *Constructors Assoc. of Western Penn.*, 573 F.2d at 815. *See also* Wright & Miller, § 2948 at 430 (policies that bear on the propriety of granting a preliminary injunction rarely are discussed directly, and are instead taken into account by the court considering a number of factors that have been found useful in deciding whether to grant or deny preliminary injunctions in particular cases).

█ In sum, courts invoke the phrase "preservation of the *status quo*" as a summary explanation of the need to protect the integrity of the applicable dispute resolution process. Thus, the court granting an injunction has the power—and indeed is required—to make all factual findings necessary to "set forth the reason for … issuance [of injunctive relief]." Fed.R. Civ.P. 65(d). Moreover, because the district court must focus on preservation of the integrity of the arbitration process, the relief granted need not be limited to restoring the parties precisely to their pre-litigation position without regard to the irreparable injury that movant faces. If the existing "status quo" is currently causing one of the parties irreparable injury and thereby threatens to nullify the arbitration process, then it is necessary to alter the situation to prevent the injury. *See Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974) (in remanding case to district court, appellate court cautioned that "focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.").

In support of its position that the "preservation of the *status quo*" serves as a jurisdictional test, Amgen relies principally on *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048. This reliance is misplaced. In *Bradley*, the Fourth Circuit held that

> where a dispute is subject to mandatory arbitration under the Federal Arbitration Act, a district court has the discretion to grant a preliminary injunction to preserve the status quo pending the arbitration of the parties' dispute if the enjoined conduct would render that process a "hollow formality." The arbitration process would be a hollow formality where "the award when rendered could not return the parties substantially to the *status quo ante*. [citation omitted]."

*Id.* at 1053–54. The *Bradley* court concluded, however, that by finding that the movant faced irreparable harm, "the district court implicitly found that arbitration of this dispute would be a hollow formality absent preliminary relief." *Id.* at 1055. As we noted above, the First Circuit's *Teradyne* decision took a similar view. While explaining that the district court "can, and should, grant a preliminary injunction in an arbitrable dispute to preserve the status quo pending arbitration," 797 F.2d at 47, the *Teradyne* court held that "a district court can grant injunctive relief in an arbitrable dispute pending arbitration, provided the [traditional] prerequisites for injunctive relief are satisfied," *id.* at 51. Accordingly, we next consider whether injunctive relief was properly issued in this case.

IV.

█ The district court's order presents a "live controversy" only to the extent that it required (1) communication and cooperation between the parties on Amgen's PLA/ELA (paragraphs four and five), and (2) the expedition of arbitration on the EPO issues (paragraph seven). The district court's rationale for granting relief, however, focused on the pending FDA approval process. The district court explained in its opinion of March 23, 1989:

> Ortho seeks, as part of its remedy through arbitration that Amgen file Ortho's pre-dialysis data as a supplement to the pending chronic renal failure PLA, as

required by the Agreement of the parties. However, if Amgen is permitted to unilaterally (without Ortho consent) amend its application to a dialysis only indication, more particularly to end-stage renal disease, and obtains FDA approval, *there will be no pending application for Amgen or Ortho to supplement.* Such a result would certainly render the pending arbitration a "hollow formality."... [I]t is clear that if Amgen is allowed to alter its FDA filing much of the relief Ortho seeks in arbitration will not be available.

709 F.Supp. at 510 (emphasis added). In other words, the district court found that Ortho would suffer irreparable harm if Amgen were permitted to narrow its PLA/ELA and refuse to submit Ortho's pre-dialysis data, because such action would exclude from FDA consideration—and thereby preclude approval here—of Ortho's bargained-for commercial market. Accordingly, the district court required that the parties submit a single PLA/ELA, which included Ortho's pre-dialysis data (paragraphs one and three of the order). The portion of the order requiring communication and cooperation is consistent with the court's finding that Ortho would suffer irreparable harm if the FDA made its approval decision on Amgen's pending PLA/ELA based on inaccurate or incomplete information. Similarly, given the indeterminate time during which the FDA could consider Amgen's application, the expedition order was consistent with the court's express preference to defer to arbitration while preventing the irreparable harm of the FDA not considering Ortho's reserved market.

With the FDA having approved Amgen's PLA covering the entire chronic renal failure indication, however, Ortho may no longer face the irreparable harm identified by the district court. Consequently, because that portion of the district order that has become moot is so intertwined with those aspects that are still live on appeal, it is impossible to evaluate whether the district court abused its discretion in issuing the relief still in force. We will vacate paragraphs four, five and seven of the order, and remand this case to the district court to determine whether, in light of subsequent developments, the portions of the order mandating communication, cooperation, and expedition of the EPO issues remain warranted under the traditional four-pronged test for preliminary injunctive relief.[8] The appeal as it relates to paragraphs one and three of the order will be dismissed as moot.

Each party to bear its own costs.

---

8. *Cf. United States v. Spectro Foods,* 544 F.2d 1175, 1180–82 (3d Cir.1976) (vacated and remanded preliminary injunction and civil contempt order where district court made no specific findings of irreparable harm stemming from defendant's enjoined conduct).