867 A.2d 1190 (2005)
375 N.J. Super. 278
Harold M. FISCHER, Plaintiff,
v.
Annette C. FISCHER, Defendant-Respondent, and
Elliot H. Gourvitz, P.A., Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted December 1, 2004.
Decided February 22, 2005.
*1192 Elliot H. Gourvitz, appellant pro se (Richard A. Outhwaite, Springfield, on the brief).
Annette C. Fischer, respondent pro se.
Harold M. Fischer, plaintiff pro se, did not file a brief or otherwise participate in this appeal.
Edwin J. McCreedy submitted a brief on behalf of amicus curiae New Jersey State Bar Association (Catherine M. Brown, Bonnie C. Frost, and Amirali Y. Haidri, Union, on the brief).
Before Judges WEFING, FALL and C.S. FISHER.
The opinion of the court was delivered by
FISHER, J.A.D.
We granted leave to appeal in this matter to consider whether or to what extent a Family Part judge has the discretion to direct the return of a retainer when permitting an attorney's withdrawal from a matrimonial action and, also, whether a Family Part judge has jurisdiction to conclusively determine any nascent fee disputes in this setting. The issue is of importance not only to those involved in this action, but also to the matrimonial bar, as evidenced by the appearance of the New Jersey State Bar Association as amicus curiae.

I
The questions presented by this appeal arise from a very old and highly contentious matrimonial action. For present purposes, we need not plumb the convoluted history of this case[1] or other related actions.[2] Instead, we predominantly focus on the fact that appellant Elliot H. Gourvitz, P.A. (Gourvitz) was retained by defendant Annette C. Fischer to represent her in this action in or about September 2003 and that, on February 11, 2004, after Mrs. Fischer claimed he was dishonest and that he had deceived her regarding the terms of the retainer agreement, Gourvitz moved to be relieved as counsel.
Mrs. Fischer opposed the motion. In exploring the reasons for her position, the trial judge learned that she no longer *1193 wanted to be represented by Gourvitz but felt she had no alternative:
MS. FISCHER: ... I have no funds to go anywhere else. I mean, 
THE COURT: If I gave you funds to go someplace else, would you still want [Gourvitz] to represent you?
MS. FISCHER: No. Because I never saw the retainer [agreement]. I paid first, and I didn't know all those things were in the retainer, and I was promised by Mr. Gourvitz he would hold the check. He wanted it. He would hold it, and then I could read the retainer in a week. Well, he cashed the check within 24 hours and I just, I have no funds to go anywhere else.
THE COURT: Okay. Thank you. You're going to get funds. I'm relieving the Gourvitz firm as Counsel, and I'm directing no later than April 1st the entire $10,000 is to be returned to Mrs. Fischer, of which $2,500 will be paid to [an expert retained on Mrs. Fischer's behalf].
When Gourvitz moved for reconsideration, the trial judge expanded on his earlier ruling:
A review of the retainer agreement ... raised very serious questions in the Court's mind as to its fairness to the client, such as retention of $5,000 once work commenced, regardless of the time spent[3] and the reservations were so much so that the Court has forwarded a copy of that agreement to the Ethics Committee for its review.
....
The basis for Mrs. Fischer's opposi[tion] was simply that she had to borrow the $10,000 to retain Mr. Gourvitz and that she had no money to hire new Counsel. This is an old case. Frankly, in August, it will be four years old. It is a complex case and is nowhere near ready for trial due to a continual[ ] parade of attorneys coming in and out of the case.
More importantly, [there has been] a pattern of behavior on behalf of the litigant, not the attorneys, to demand recusal of several Judges the moment an adverse decision is given[4]....
....
It is against this backdrop that the Court ordered the $10,000 returned to enable the defendant to immediately retain new Counsel, thereby granting Mr. Gourvitz the request to be relieved and satisfying the objection of the litigant, while at the same time, keeping control of the case and moving it to conclusion. Simply put, [but for the return of funds from Gourvitz], Mrs. Fischer would be incapable of representing herself.
These comments and the remainder of his decision on the motion for reconsideration demonstrate that the trial judge permitted Gourvitz to be relieved as counsel by weighing a number of factors, including, most notably, the age of the case, the further significant delays that could be anticipated if Mrs. Fischer's retainer was not returned, and the fairness of the retainer agreement itself. Based on these factors, the trial judge viewed his April 13, 2004 order as an appropriate exercise of *1194 his discretion in ruling upon the motion to be relieved as counsel, R. 5:3-5(d)(2), and in effectively managing what is indisputably a problem case.
It is particularly relevant that, in denying the motion for reconsideration, the trial judge emphasized that he had not finally adjudicated the parties' future fee disputes, as the following colloquy reveals:
MR. OUTHWAITE: Your Honor also mentioned ... fee arb[itration]. We have a very good and mandatory fee arbitration procedure in the State of New Jersey.
THE COURT: I understand that. I will allow for that, but I'll tell you, this Court has a primary obligation to move the case to closure. This is a four-year-old case. It's an old, old case....
....
MR. OUTHWAITE: What Your Honor could have done [in granting the motion to be relieved] was say that the fee arbitration committee was to meet on the next day because 
THE COURT: Oh, right.
MR. OUTHWAITE: It could have been done.
THE COURT: ... There's no way  first of all, it would be arrogant for this Court to compel [the] fee arbitration [committee] to move other than in the ordinary way and the Court wouldn't do it.
....
[T]his Court does not preclude a fee arbitration that could take place simultaneously with the Court moving this case and, if the fee arbitration committee sides with Mr. Gourvitz, that would be the law of the case and the Court at the time of final disposition would consider [ordering payment of the fee] from Mrs. Fischer's equitable distribution [award].
Accordingly, since the trial judge made no attempt to finally adjudicate whether or to what extent Gourvitz was entitled to have his fees paid by Mrs. Fisher, the April 13, 2004 order, as to which we granted leave to appeal, must be viewed as being far more limited in scope than suggested by Gourvitz and, also, by the New Jersey State Bar Association, which we invited to participate in this appeal as amicus curiae.

II
In considering whether the trial judge was authorized, in the context of this matrimonial action, to order the return of a party's retainer while permitting the attorney's withdrawal so late in the proceedings, we start where our description of the proceedings, contained in the section above, ended. That is, in urging our reversal of the order in question, both Gourvitz and the State Bar Association have expressed alarm about what they perceive was the trial judge's exceeding of his jurisdiction. They claim that the judge had no authority to finally adjudicate the reasonableness of Gourvitz's fees. We agree with Gourvitz and the State Bar Association that the trial court's subject matter jurisdiction in a matrimonial action does not normally encompass the power to adjudicate financial disputes that may crop up between a litigant and the litigant's attorney. See Cohen v. Cohen, 146 N.J.Super. 330, 369 A.2d 970 (App.Div.1977). Indeed, we have held that a finding as to the reasonableness of the fee one matrimonial litigant is required to pay to another, pursuant to R. 4:42-9(a)(1) and R. 5:3-5(c), does not necessarily impact upon that litigant's obligation to compensate an attorney for services rendered pursuant to the terms of a valid and enforceable written retainer agreement, see Gruhin & Gruhin, P.A. v. Brown, 338 N.J.Super. 276, 281, 768 A.2d 822, 825 (App.Div.2001), and by no means do we suggest there should be a departure from these principles. Contrary to the way Gourvitz and the State Bar Association have phrased *1195 the issue presented by this appeal, we have no cause to consider whether a Family Part judge has jurisdiction to adjudicate a fee dispute because, here, the trial judge made no findings as to the reasonableness of the fees charged[5] nor did he attempt to deprive the attorney and the client of their ability to seek an adjudication of their disputes before a fee arbitration committee or any other appropriate forum.[6]
Since the trial judge did not attempt to finally resolve whether Gourvitz was entitled to any of the funds he was ordered to return to Mrs. Fischer, the issue before us is limited to whether the judge was empowered to order a return of those funds, for their use elsewhere, while still leaving unresolved the attorney's claim to those fees. We conclude that the judge possessed the power to render this relief and, in that regard, fairly and appropriately exercised his discretion.
First, despite the contrary contentions of Gourvitz and the State Bar Association, there can be no question as to the trial judge's jurisdiction to grant relief of this nature so long as it was without prejudice to the resolution of the parties' fee disputes in the proper forum. With the filing of a complaint seeking the marriage's dissolution, the court was imbued with the jurisdiction to take all reasonable and just steps in equitably distributing the parties' marital property. N.J.S.A. 2A:34-23.1. All their marital property  whether real or personal, tangible or intangible, titled or possessed jointly or individually, held by a non-party in trust, or existing merely as a chose in action  was in custodia legis and, thus, the court had subject matter jurisdiction over Mrs. Fischer's claim to the return of the funds she paid to Gourvitz, and was empowered to order the fund's return to Mrs. Fischer or to some other locale subject to the court's control.
In this sense, the trial judge could be said to have exercised the equity powers inherently possessed by a Family Part judge, Carr v. Carr, 120 N.J. 336, 351, 576 A.2d 872, 879-80 (1990), in directing the return of the funds from the withdrawing attorney. Similarly, in Steiger v. Armellino, 315 N.J.Super. 176, 183-84, 716 A.2d 1216, 1219-20 (Ch.Div.1998), the court utilized its inherent equity powers to enjoin the disbursement of trust funds to a matrimonial litigant. This relief was granted in favor of an attorney who had represented that litigant at an earlier stage of the matrimonial action that produced the trust funds, even though their fee dispute would ultimately be resolved in another forum. *1196 Because the plaintiff-attorney successfully demonstrated that he held an attorneys' lien on his former client's file, the court enjoined the movement of funds held by a succeeding attorney pending the resolution of fee arbitration between the plaintiff-attorney and the client. In granting that relief, the court did not resolve the fee dispute but only preserved the res of that dispute pending resolution of the fee dispute in its proper forum. See also Ortho Pharm. Corp. v. Amgen, Inc., 882 F.2d 806, 812 (3rd Cir.1989); Central Jersey Freightliner, Inc. v. Freightliner Corp., 987 F.Supp. 289, 295 (D.N.J.1997); Davenport v. Blue Cross of Calif., 52 Cal.App.4th 435, 60 Cal.Rptr.2d 641, 650 (1997). Here, in like manner, the trial judge directed the return of the retainer and permitted its use elsewhere while preserving Gourvitz's right to seek its repayment, in a proper forum, at a later date. We conclude that the order in question was the product of a reasoned balancing of the parties' competing interests and, thus, represented a valid exercise of the court's equity powers.
We also conclude that the trial judge was imbued with the discretion to enter the relief in question because Gourvitz sought to be relieved as counsel at a time that required the application of the provisions of R. 5:3-5(d)(2). The very circumstances that the trial judge weighed in determining whether Gourvitz should have been relieved as counsel are expressly contained in the rule itself:
The motion shall be supported by the attorney's affidavit or certification setting forth the reasons for the application and shall have annexed the written retainer agreement. In deciding the motion, the court shall consider, among other relevant factors, the terms of the written retainer agreement and whether either the attorney or the client has breached the terms of that agreement; the age of the action; the imminence of the Matrimonial Early Settlement Panel hearing date or the trial date, as appropriate; the complexity of the issues; the ability of the client timely to retain substituted counsel; the amount of fees already paid by the client to the attorney; the likelihood that the attorney will receive payment of any balance due under the retainer agreement if the matter is tried; the burden on the attorney if the withdrawal application is not granted; and the prejudice to the client or to any other party.
While Gourvitz and the State Bar Association argue that this rule permits only the granting or denial of withdrawal, we decline to read the rule so restrictively. Instead, we believe that, in extraordinary circumstances, the court may both permit the withdrawal of counsel and yet impose reasonable conditions upon that withdrawal for the benefit of the client and the ultimate resolution of the case, so long as those conditions are reasonable and do not unduly burden the withdrawing attorney. In considering the predicament presented by Gourvitz's motion, in this aged and problematic case, the court fairly weighed all the factors set forth in R. 5:3-5(d)(2) and reached a solution that freed Gourvitz of the burden of attempting to zealously represent Mrs. Fischer in light of her accusations and loss of faith in him, that provided Mrs. Fischer with the funds to obtain new counsel without depriving Gourvitz of his ultimate right to be compensated, and that kept the case on track, as best as could be expected, in the circumstances.
The judge's oral decisions, both on the original motion and on the motion for reconsideration, indicate that he properly considered (1) the terms of the retainer agreement and emphasized  quite correctly  that its non-refundable fee provision violated R. 5:3-5(b) and was unethical[7]; *1197 (2) the allegation that even though Gourvitz advised Mrs. Fischer that she could have a week to review the retainer agreement before he negotiated her $10,000 check, he breached that promise by negotiating the check the next day; (3) the extreme age of the case,[8] (4) the pretrial conference and trial dates, at the time of the initial ruling, were 24 and 52 days away, respectively; (5) the fact that the case's complexities and convolutions had rendered difficult its efficient management in the future and that this case had already unduly burdened the Family Part in Essex County[9]; (6) the fact that, without these funds, Mrs. Fischer would be unable to retain new counsel; (7) the impact on Gourvitz caused by the return of the payments that might have arguably been due and payable; (8) the likelihood that Gourvitz would be compensated in the future, if entitled, from Mrs. Fischer's share of equitable distribution; (9) the burden on Gourvitz if his motion was not granted (which the trial judge alleviated by permitting his withdrawal); and (10) the prejudice to Mrs. Fischer, again, noting his concern that she would not have been able to retain new counsel if the retainer was not returned and that her claims against Dr. Fischer  including her allegations that he was over $280,000 in arrears in pendente lite support and that the marital home was in, or facing, foreclosure  would be further delayed if the fund was not made available for the retention of new counsel.[10]
We add that a Family Part judge in this situation should also consider the availability of a marital asset that might be liquidated in order to fund the retention of new counsel, see R. 5:3-5(c), although we caution that the judge should likewise consider any prejudice that might result. That is, if we assume, without necessarily deciding, the power of a court to sell a marital home pendente lite, as suggested in Pelow v. Pelow, 300 N.J.Super. 634, 693 A.2d 564 (Ch.Div.1996), we would question the use of this power to provide a relatively small sum, particularly when the liquidation of such a marital asset will undoubtedly produce other substantial problems. For example, in that circumstance, the party residing in the marital home would then be obligated to incur the present and future cost of securing other housing, as well as additional legal fees. Thus, we would think it disproportionate, in most if not all cases, to order a pendente lite sale of a marital home for the sole purpose of funding the retention of counsel. While the court would certainly be authorized, R. 5:3-5(c),1111[11] and while it might be a sensible *1198 solution, to order the pendente lite sale of some other non-productive marital asset for this purpose, the record on appeal does not suggest the existence of any such asset. In opposing his return of the retainer, Gourvitz  presumably knowledgeable of the parties' marital assets  did not indicate there was any asset that could be liquidated to provide a retainer for new counsel, let alone an asset that, if liquidated, would not cause greater prejudice to the parties than it would alleviate.[12]
R. 5:3-5(d)(2), as demonstrated by the ten factors which the trial judge was required to weigh, is not designed purely for the benefit of the withdrawing attorney, as the arguments in favor of reversal would appear to suggest. Instead, as the comment to the rule indicates, these procedures provide the court "with the discretion to protect not only the client's representation interests but also the financial interests of attorney and client." Pressler, Current N.J. Court Rules, comment on R. 5:3-5 (2005). We would add to Judge Pressler's comment another factor to be accounted for in this calculus: that the unconditioned granting of such relief at a late stage also tends to burden the efficient administration of justice.[13] Our already congested Family Part calendars give rise to a considerable demand by litigants for access to the scarce judicial resources available. While each case requires careful consideration, any case that obtains a disproportionate share of the court's time  particularly when that time is expended on side issues that do little or nothing to advance the merits of a case  reduces the opportunities of other litigants to obtain their fair share of the court's attention. As a result, the change of attorneys that frequently occurs during the pendency of matrimonial matters, particularly hotly-contested matters such as the case at hand, inevitably delays not only the resolution of the suit in question but also unreasonably hinders the many other pending cases that are shunted aside while a problem case such as this takes more than an appropriate amount of the court's time. R. 5:3-5(d)(2) provides a trial judge with the discretion to alleviate that injustice by either refusing an attorney's request to be relieved at such a late date, or by permitting withdrawal on conditions that insure, as best as can be hoped, the case's expeditious resolution.
We detect no abuse of discretion in the trial judge's ruling that has been questioned in this appeal. Indeed, the trial judge's order, considering the extraordinary history of this action, very sensibly and pragmatically resolved the motion to be relieved in a manner that fairly balanced the concerns of the litigants and the attorneys involved, and the administration of justice as well.

III
In so holding, we caution that the result reached by the trial judge is not necessarily a panacea for all similar problems that *1199 may arise. Instead, as the terms of R. 5:3-5(d)(2) suggest, each application to withdraw as counsel has to be weighed against the backdrop of its own particular circumstances. While we would tend to believe that the relief granted by the trial judge here is unusual, we certainly would not foreclose the possibility of similar dispositions of applications to withdraw as counsel in particularly egregious circumstances. In an appropriate case, such relief is authorized not only by the express terms of R. 5:3-5(d)(2), but also through resort to the court's inherent equity powers, see Carr, supra, 120 N.J. at 351, 576 A.2d at 879-80.
Affirmed.
FALL, J.A.D., concurring.
I agree with the result reached in the majority opinion issued by my colleagues. The unusual and extraordinary circumstances presented to the motion judge fully warranted the relief granted as part and parcel of the order relieving the Gourvitz firm as counsel for defendant. However, the sanctioning of a procedure that permits a Family Part judge to direct an attorney to return the entirety of a retainer to his or her client in order to fund the retainer for succeeding counsel or otherwise fund the continued litigation costs is an unusual and extraordinary remedy that should have prescribed limits that are consistent with the rule-based scheme adopted by the Supreme Court, which were developed after years of study.
I write separately because I am concerned that the majority decision may be viewed and applied too broadly. In my view, a family law attorney who enters into a retainer agreement with a litigant that fully complies with the content requirements of R. 5:3-5(a), and does not contain provisions proscribed by R. 5:3-5(b), should not be subject to the court's discretionary exercise of its equitable authority in the form of an order compelling the return of that retainer to the litigant upon the grant of a withdrawal application, unless the court also finds that the actions of that attorney have, in some way, contributed to the circumstances that have led to that withdrawal application and the consequent inability of the litigant to retain a substitute attorney. Moreover, where services have been expended on behalf of the litigant the court should not require a withdrawing attorney to refund a retainer unless the court also finds that there are no marital assets that can be sold, mortgaged, otherwise encumbered or pledged to fund the litigation in accordance with the discretionary authority vested in the court by R. 5:3-5(c).
Here, both criteria are satisfied. The Gourvitz firm retainer agreement executed in this case contained a non-refundable retainer clause, which is specifically prohibited by R. 5:3-5(b). Moreover, the retainer agreement was overbearing, given the well-known circumstances that led to defendant's retention of the Gourvitz firm, namely, that she had to borrow funds to retain that firm. Specifically, the agreement required that the $10,000 retainer be replenished on a monthly basis. It also must have been evident to the Gourvitz firm that this representation involved acrimonious, intense and elongated litigation.
However, less than four months into defendant's representation, when the issue of fees was apparently discussed, the Gourvitz firm issued a letter to defendant dated January 12, 2004, that stated:
You have informed me that you cannot afford to continue to have me represent you. You must understand that I cannot be expected to provide legal services without compensation. Accordingly, I no longer continue to represent you. Please sign and return the enclosed Substitution of Attorney.

*1200 [Emphasis added.]
At that stage of this multi-year litigation, R. 5:3-5(d)(2) authorized counsel to withdraw from representation "only by leave of court on motion on notice to all parties[,]" even if the client had consented. Gourvitz's attempt to remove himself from the case by stating "I no longer continue to represent you[,]" was clearly improper and contrary to that rule.
The record supports the conclusion that the circumstances that led to the eventual withdrawal application by the Gourvitz firm  supported by contentions of dishonesty and deceit  were created by the very terms of the retainer agreement and the improper action by the Gourvitz firm in essentially attempting to discharge its client without court approval.
It is undisputed that there has been no determination by any court or fee-arbitration committee concerning the reasonableness of the fees charged by the Gourvitz firm to defendant. Indeed, the record on appeal reflects there is a substantial dispute between defendant and the Gourvitz firm on that issue. The Gourvitz firm contends it expended services valued at $12,018.77 against the retainer of $10,000 paid by defendant. Defendant hotly disputes that contention, asserting numerous irregularities in the retainer agreement itself, inaccuracies in the billing, and the failure of the Gourvitz firm to otherwise comply with the "Statement of Client Rights and Responsibilities in Civil Family Actions" contained in Pressler, Current N.J. Rules, Appendix XVIII (2005). The structure in place for ultimate resolution of the fee dispute between the Gourvitz firm and defendant is through application of the fee-arbitration provisions contained in R. 1:20A-1 to -6, or in a separate Law Division action and is left undisturbed by this court's opinion.
Here, the motion judge was presented with an extremely difficult situation. In addition to being a very contentious, high-conflict and complex matter, this matrimonial litigation had been pending  at the time the motion judge considered Gourvitz firm's motion to withdraw on March 26, 2004  in one form or another, for more than nine years. Additionally, defendant had been represented by several prior counsel and, for reasons not relevant to this appeal, apparently several other Family Part judges in the Essex vicinage had disqualified themselves from handling the matter.
In my view, the factors set forth in R. 5:3-5(d)(2) prescribe the criteria for the court to consider in determining whether the attorney should be permitted to withdraw from representation, and do not themselves authorize an order requiring the withdrawing attorney to refund the entirety of a retainer paid when it is evident that significant legal services have been rendered that are at least, on a prima facie basis, chargeable against that retainer. Even the motion judge, during colloquy at the April 23, 2004 hearing, recognized that significant services had already been rendered by the Gourvitz firm to defendant.
My conclusions are informed by the fact that the lawyer-client relationship in Family Part cases has drawn significant attention from the court system for more than a decade, in an effort  charted by the Supreme Court  to alleviate the adverse impact that disputes between attorneys and their clients have on the ability of the courts to expeditiously and efficiently adjudicate or resolve pending matters. In its report issued on February 26, 1993, the New Jersey Ethics Commission, more commonly known as the "Michels Commission," noted that during the course of its numerous public hearings held throughout our State, "no one area of the law was more intensely criticized than matrimonial *1201 law." Final Report of the Supreme Court Special Committee on Matrimonial Litigation (Final Report), at 5 (February 4, 1998) (citing to Report of New Jersey Ethics Commission, at 17 (February 26, 1993)). The Michels Commission recommended that a special committee should be appointed "to review the entire practice of matrimonial law, with particular emphasis on fee practices and other related issues." Ibid.
On April 9, 1996, the Supreme Court appointed the Special Committee on Matrimonial Litigation to examine all aspects of matrimonial practice. Ibid. That Committee, which was co-chaired by Mercer County Assignment Judge Linda R. Feinberg and long-time Supreme Court Family Practice Committee member and then-Chair of the Supreme Court Disciplinary Review Board, Lee R. Hymerling, Esq., embarked on an exhaustive study of the practice of law in matrimonial cases that included conducting several public hearings.
On February 4, 1998, the Special Committee issued its Final Report. It noted, inter alia, that "[a] common theme that resounded throughout much of the testimony [at those public hearings] was that the process of divorce took too long and cost too much." Final Report, supra, at 7. The Final Report made fifty-four specific recommendations to the Supreme Court, many of which were accepted by the Court and implemented in the form of rule amendments. See Administrative Determinations by the Supreme Court on the Recommendations of the Special Committee on Matrimonial Litigation, January 21, 1999, 8 N.J.L.J. 233 (1999); 155 N.J.L.J. 513 (1999); Pressler, Current N.J. Court Rules, comment 3 to R. 5:1-1 (2005).
The rules governing civil family actions were substantially revised effective April 1999 in an effort to improve the practice in three main respects: first, the general expedition of the movement of family actions through the courts by improved pretrial and trial case management; second, the amelioration of the perceived abuses in the financial aspects of the attorney-client relationship; and third, the provision of more effective enforcement techniques.
* * * *
With respect to the attorney-client relationship, a new rule, R. 5:3-5, was adopted to replace former R. 1:11-2 (withdrawal and substitution), R. 1:21-7A (retainer agreements in family actions) and R. 4:42-9(a) (award of counsel fees in family actions), and instead, to provide a comprehensive governance of these matters with prescribed requirements, restrictions and limitations on the financial aspects of the representation.
[Pressler, supra, comment 3 to R. 5:1-1 (emphasis added).]
The Supreme Court concurred with the recommendation contained in the Final Report that the court rules be amended to authorize the Family Part to utilize assets to fund matrimonial litigation, by adopting R. 5:3-5(c), which states:
Subject to the provisions of R. 4:42-9(b), (c), and (d), the court in its discretion may make an allowance, both pendente lite and on final determination, to be paid by any party to the action, including, if deemed to be just, any party successful in the action, on any claim for divorce, nullity, support, alimony, custody, parenting time, equitable distribution, separate maintenance, enforcement of interspousal agreements relating to family type matters and claims relating to family type matters in actions between unmarried persons. A pendente lite allowance may include a fee based on an evaluation of prospective services *1202 likely to be performed and the respective financial circumstances of the parties. The court may also, on good cause shown, direct the parties to sell, mortgage, or otherwise encumber or pledge marital assets to the extent the court deems necessary to permit both parties to fund the litigation. In determining the amount of the fee award, the court should consider, in addition to the information required to be submitted pursuant to R. 4:42-9, the following factors: (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.
[Emphasis added.]
In discussing recurring difficulties in application of the standards for considering an application by counsel for withdrawal from representation of a Family-Part litigant, the Final Report stated, in pertinent part:
The Committee has concluded that the issues of: (a) assuring that litigants have access to sufficient resources to prosecute the litigation; (b) whether attorneys should be permitted to take security interests upon litigants' assets to secure fees; and (c) the standard by which attorneys should be permitted to withdraw from litigation are intrinsically intertwined and must be considered together.
Considering these three issues together, the Committee has concluded that case law should be relaxed to permit courts, upon a showing of good cause, to utilize marital assets to fund litigation; that matrimonial attorneys should be precluded from taking security interests in their clients' assets during the course of their active representation of those clients' and that the Kriegsman [v. Kriegsman, 150 N.J.Super. 474, 375 A.2d 1253 (App.Div.1977)] rule[1] concerning withdrawal must be relaxed.
[Final Report, supra, at 28-29.]
The Supreme Court also adopted the recommendation in the Final Report that attorneys be precluded from taking a security interest in a client's property, and placed additional limitations on the content of retainer agreements, including prohibiting the inclusion of a non-refundable retainer provision. R. 5:3-5(b) sets forth those limitations, as follows:
During the period of the representation, an attorney shall not take or hold a security interest, mortgage, or other lien on the client's property interests to assure payment of the fee. This Rule shall not, however, prohibit an attorney from taking a security interest in the property of a former client after the conclusion of the matter for which the attorney was retained, provided the requirements of R.P.C. 1.8(a) shall have been satisfied. Nor shall the retainer agreement include a provision for a non-refundable retainer. Contingent fees pursuant to R. 1:21-7 shall only be permitted as to claims based on the tortious conduct of another, and if compensation *1203 is contingent, in whole or in part, there shall be a separate contingent fee arrangement complying with R. 1:21-7. No services rendered in connection with the contingent fee representation shall be billed under the retainer agreement required by [R. 5:3-5(a)], nor shall any such services be eligible for an award of fees pursuant to [R. 5:3-5(c)].
[Emphasis added.]
In order to give recognition to the importance of matrimonial litigants being placed on an equal playing field with respect to their financial ability to retain and pay their respective attorneys, the prohibition against an attorney taking a security interest in his or her client's property set forth in R. 5:3-5(b) and the other limitations contained therein were offset by the provision set forth in R. 5:3-5(c), authorizing the court to order the sale, mortgaging, encumbering or pledging of marital assets to fund the litigation, both pendente lite and on final determination. See Pressler, supra, comment 3 to R. 5:3-5.
In discussing its recommendation that the Kriegsman rule be relaxed, the Final Report stated:
The Committee has concluded that, absent consent and the substitution of counsel or the client appearing pro se, applications to withdraw should remain subject to the discretion of the individual Family Part judge who would be called upon to make the determination within the framework of this Committee's recommendation. In exercising its discretion, the court must be mindful of the three distinct interests that are implicated in the determination of withdrawal applications. The court must be mindful of the rightful concerns of litigants, counsel and the court's own responsibility to manage its docket in the public interest.
[Final Report, supra, at 50.]
In considering the recommendations and analysis contained in the Final Report on the subject of withdrawal of counsel, the Supreme Court adopted R. 5:3-5(d), which provides:
(1) An attorney may withdraw from the representation ninety (90) days or more prior to the scheduled trial date or prior to the Matrimonial Early Settlement Panel hearing, whichever is earlier, upon the client's consent in accordance with R. 1:11-2(a)(1). If the client does not consent, the attorney may withdraw only on leave of court as provided in subparagraph (2) of this rule.
(2) After the Matrimonial Early Settlement Panel hearing or after the date ninety (90) days prior to the trial date, whichever is earlier, an attorney may withdraw from the action only by leave of court on motion on notice to all parties. The motion shall be supported by the attorney's affidavit or certification setting forth the reasons for the application and shall have annexed the written retainer agreement. In deciding the motion, the court shall consider, among other relevant factors, the terms of the written retainer agreement and whether either the attorney or the client has breached the terms of that agreement; the age of the action; the imminence of the Matrimonial Early Settlement Panel hearing date or the trial date, as appropriate; the complexity of the issues; the ability of the client timely to retain substituted counsel; the amount of fees already paid by the client to the attorney; the likelihood that the attorney will receive payment of any balance due under the retainer agreement if the matter is tried; the burden on the attorney if the withdrawal application is not granted; and the prejudice to the client or to any other party.
[Emphasis added.]
*1204 In appointing the Special Committee on Matrimonial Litigation, the Supreme Court embarked upon an exhaustive study and analysis in an attempt to address the clear adverse impact that disputes between attorneys and their clients have on the ability of the courts to expeditiously and efficiently adjudicate or resolve pending Family Part matters. The solutions, forged by the Court in the form of these rule amendments, provided a framework designed to balance the rights of litigants, attorneys, and the court's responsibility to manage its docket in the public interest. Those rule-based solutions did not specifically vest the Family Part with discretion to order a withdrawing attorney to refund the entirety of a retainer in order to fund the litigation.
However, where, as here, the circumstances that led to the motion to withdraw are created, at least in part, by the content of the retainer agreement and the attempt by the attorney to end the lawyer-client relationship in a manner contrary to court rules, the motion judge should be permitted to weigh and balance the interests of the litigant, counsel and the court's own responsibility to manage its docket in formulating an appropriate solution to the problem created by withdrawal. See Final Report, supra, at 28.
Although the record is not entirely clear, it appears that there were no marital assets that the trial court could have ordered be sold, mortgaged, or otherwise encumbered or pledged to fund the litigation in accordance with R. 5:3-5(c). However, where such marital assets do exist, a court considering a withdrawal application should generally fund the costs of continuing the litigation after withdrawal by exercising the authority set forth in R. 5:3-5(c), prior to considering an order requiring an attorney to refund the retainer.
In conclusion, I would limit the Family Part's authority to order the return of a retainer to a litigant, upon the withdrawal of counsel, to those situations where both the conduct of the withdrawing attorney has led to the circumstances necessitating withdrawal, and there is no available source to fund the litigation through application of the provisions contained in R. 5:3-5(c). These criteria are consistent with the rule-based scheme designed by the Supreme Court to address such situations to properly balance the rights of litigants, attorneys and the court's responsibility to manage its docket.
NOTES
[1] For example, while the trial judge observed, at the time of the rulings in question, that this case was nearly four years old, in fact this matrimonial action was commenced in 1995. As best as can be determined from the limited information provided on appeal, this action (formerly Docket No. FM-07-1917-95) was apparently assigned a new docket number (Docket No. FM-07-805-03) sometime in 2003.
[2] The matter has also been impacted by a General Equity matter that was filed in Union County regarding a business owned by these marital partners and a personal bankruptcy proceeding commenced by plaintiff Harold M. Fischer.
[3] The retainer agreement contains the following improper provision: "In the event that the amount of time we spend on your case (and the resulting fee generated) is less than the amount of money you have paid us, the unused money shall be promptly returned to you, except for a minimal fee of $5,000.00. This non-refundable fee may exceed the attorney's ordinary hourly time charge" (emphasis added).
[4] The trial judge noted, in his oral decision, the extraordinary fact that all the judges assigned to the Family Part in Essex County, except the trial judge, had disqualified themselves in earlier proceedings.
[5] Indeed, we find the argument of Gourvitz and the State Bar Association that "the facts of this case were that the entire $10,000 had been earned" to be entirely inconsistent with their argument that the trial judge was not empowered to decide what part of the fee had been earned and what had not.
[6] For there to be fee arbitration pursuant to R. 1:20A-1 to -6, the attorney must first serve a "pre-action notice" on the client. It is then up to the client to timely demand fee arbitration or else the attorney may commence legal proceedings. See R. 1:20A-6; Musikoff v. Jay Parrino's The Mint, L.L.C., 172 N.J. 133, 139, 796 A.2d 866, 869-70 (2002); Cole, Schotz, Bernstein, Meisel & Forman, P.A. v. Owens, 292 N.J.Super. 453, 457-58, 679 A.2d 155, 157 (App.Div.1996). None of these events has yet occurred and, thus, there is no reason to presume that the reasonableness of Gourvitz's fee would not ultimately be determined by the court. While Gourvitz and the State Bar Association argue that such a suit would have to be decided in the Law Division, we see no reason why  should Mrs. Fischer not demand fee arbitration  an action filed by Gourvitz in the Law Division could not be consolidated with this matrimonial action. Indeed, except for its potential to delay the matrimonial proceedings, consolidation of the claims would appear to make sense, since the trial judge is familiar with some of the services rendered by Gourvitz and is in a unique position to determine their reasonableness.
[7] While R. 5:3-5(b) states, without exception, that no retainer agreement "shall ... include a provision for a non-refundable retainer," Gourvitz continues to argue, with no apparent regard for the rule, that his agreement with Mrs. Fischer only called for a "minimal" non-refundable retainer of 50%. While the State Bar Association, like Gourvitz, seeks reversal of the order under review, we observe that the State Bar Association made no attempt to claim that Gourvitz's retainer agreement was proper; instead, the State Bar Association acknowledged that Gourvitz's inclusion of a non-refundable retainer provision in the agreement "was ripe for referral to the Ethics Committee."
[8] As noted earlier, it appears that these divorce proceedings were actually commenced in 1995. Notwithstanding, we would view this as an unduly aged case even if it was only four years old.
[9] As observed earlier, the trial judge indicated that all other Family Part judges in Essex County had disqualified themselves from presiding over this action.
[10] The hardship to Mrs. Fischer was amplified by the fact that Gourvitz claimed, in moving for reconsideration, that he was financially unable to return the funds.
[11] R. 5:3-5(c) states, in part, "[t]he court may also, on good cause shown, direct the parties to sell, mortgage, or otherwise encumber or pledge marital assets to the extent the court deems necessary to permit both parties to fund the litigation."
[12] While the record refers to the marital home in Short Hills where Mrs. Fischer resides, it also indicates that the home is in, or about to face, foreclosure.
[13] The consideration of the public's interest in the court's sensible managing of its docket was in fact understood to be an element of the court's exercise of discretion in such matters. See Final Report of the Supreme Court Special Committee on Matrimonial Litigation at 50 (February 4, 1998) ("In exercising its discretion, the court must be mindful of the three distinct interests that are implicated in the determination of withdrawal applications. The court must be mindful of the rightful concerns of litigants, counsel and the court's own responsibility to manage its docket in the public interest.").
[1] Kriegsman, supra, 150 N.J.Super. at 479, 375 A.2d at 1255, held that when a firm "accepts a retainer to conduct a legal proceeding, it impliedly agrees to prosecute the matter to a conclusion. The firm is not at liberty to abandon the case without justifiable or reasonable cause, or the consent of its client."